IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| FIRST STATE BANK OF NORTHWEST ARKANSAS,<br><br>Plaintiff,<br><br>v.<br><br>THE MCCLELLAND QUALIFIED PERSONAL RESIDENCE TRUST, *et al.*,<br><br>Defendants. | CIVIL ACTION NO. 5:14-CV-130 (MTT) |

## ORDER

Defendant Joseph P. McClelland, Jr., Defendant The McClelland Qualified Personal Residence Trust (the "Trust"), and Plaintiff First State Bank of Northwest Arkansas have moved for summary judgment. (Docs. 35; 45; 56). For the following reasons, the motions are **DENIED**.

### I. BACKGROUND[1]

In 2005 and 2006, McClelland, Jr. took out two loans – Loan 2000 and Loan 6800 – from First Georgia Community Bank ("First Georgia"), where he served on the board of directors. (Docs. 61 at 75:7-13; 66-1 at ¶ 1). According to McClelland, Jr., as First Georgia grew and needed additional capital it had an "agreement" with its directors: they would borrow money from other banks, buy stock from First Georgia, and then use that stock as collateral to borrow money from First Georgia. (Doc. 61 at 75:7-76:21). Thus, McClelland, Jr. understood that Loan 2000 and Loan 6800 were cross-

---

[1] The following facts are viewed in the light most favorable to the Defendants.

collateralized against all of his collateral at First Georgia, including the stock he owned. (Doc. 61 at 20:24-21:12, 24:8-13).

In late 2007, McClelland, Jr. was diagnosed with cancer. (Doc. 61 at 73:22-74:2). Dan Fears, who also served on the board of directors, suggested to McClelland, Jr. that he make sure his estate plan was in order. (Doc. 61 at 67:25-68:9). Around the same time, McClelland, Jr. believed the government was considering reducing the estate tax exemption level from $5 million to $1.5 million. (Doc. 61 at 68:10-13). Accordingly, McClelland, Jr. "decided to undertake some estate planning efforts" and hired his attorney and son, Joseph P. McClelland, III, to create an estate plan. (Doc. 61 at 67:25-69:6). McClelland, Jr. testified that the purposes of estate planning were to minimize the amount of tax he needed to pay and to "keep the family property." (Doc. 61 at 143:14-23). He testified "[his] plan was to move tangible assets to the [T]rust and to [T]he McClelland [Family Limited Partnership] [the "Partnership"] and to keep all negotiable stuff, cash and stocks and stuff, outside. That was going to be my retirement."[2] (Doc. 61 at 72:24-73:4).

In March 2008, McClelland, Jr. made five transfers of real property to the Partnership and one transfer to the Trust.[3] (Doc. 66-1 at ¶¶ 2, 4, 6, 8, 10, 12). On June 17, 2008, he transferred a cabin in North Carolina to the Partnership. (Docs. 61 at 170:1-4; 66-1 at ¶ 15). The properties transferred in March 2008 were transferred by

---

[2] The general partner of the Partnership is The McClelland Family LLC, whose members are Allison McClelland, McClelland, Jr.'s daughter, and McClelland, III. (Doc. 66-1 at ¶ 40). The limited partners of the Partnership are McClelland, Jr., Allison McClelland, and McClelland, III. (Doc. 66-1 at ¶ 41). The trustee of the Trust is McClelland, III and the beneficiaries of the Trust are McClelland, Jr., Allison McClelland, and McClelland, III. (Doc. 66-1 at ¶ 39).

[3] All of this property is located in Butts County, Georgia. (Doc. 66-1 at ¶ 26). The property transferred to the Trust was McClelland, Jr.'s personal residence, and the remaining property is the surrounding acreage. (Docs. 61 at 81:2-4, 120:21-121:5; 66-1 at ¶¶ 26-27).

Deed of Gift for a sale price of $0.00 and had a provable "As-Is" market value of $800,000.00.  (Doc. 66-1 at ¶¶ 3, 5, 7, 9, 11, 13, 16).  The North Carolina cabin had a provable "As-Is" market value of $114,000.00, and the recording stamp for the transfer shows that an excise tax of $0.00 was assessed.[4]  (Doc. 66-1 at ¶¶ 15, 17).  As of March 2008, McClelland, Jr. testified that he still had around $50,000 in cash, around $500,000 in "excess collateral" at First Georgia, meaning the value of the stock he had "versus the notes it was collateralizing," and that First Georgia owed him $97,000 from his deferred compensation and bank-owned life insurance.  (Doc. 61 at 72:3-20).

      Notwithstanding the apparent lack of consideration for the transfers, McClelland, Jr.; McClelland, III; Allison McClelland; and Leila M. Robinson, McClelland, Jr.'s ex-wife, testified that the transfers were made for reasonably equivalent value.  Specifically, McClelland, Jr., Allison McClelland, and Robinson all testified that McClelland, Jr. had a contract with Allison "that if she went to graduate school and maintained the NC property, then she would be deeded the property."  (Docs. 45-3 at ¶ 2; 61 at 79:9-23; 45-5 at ¶ 1; 62 at 29:12-17; 45-6 at ¶¶ 2-3).  Allison graduated from graduate school and maintained and continues to maintain the property.  (Docs. 45-3 at ¶¶ 3-4; 45-5 at ¶¶ 2-4; 62 at 29:12-17).  Moreover, McClelland, Jr. testified that he had an understanding with McClelland, III that he would transfer the property in exchange for his son's legal work and that this has "kind of been implied since I paid for his … law school."  (Doc. 61 at 81:5-15).  McClelland, III testified that he provided $19,000 of legal work regarding the estate planning efforts and that he has generally provided almost

---

[4] Under North Carolina law, "[a]n excise tax is levied on each instrument by which any interest in real property is conveyed to another person.  The tax rate is one dollar ($1.00) on each five hundred dollars ($500.00) or fractional part thereof of the consideration or value of the interest conveyed."  N.C. GEN. STAT. § 105-228.30(a).

$175,000 of legal representation to McClelland, Jr., the Partnership, and the Trust.[5] (Docs. 45-4 at ¶¶ 4-5; 63 at 25:7-26:17). Finally, McClelland, Jr. testified that he had a mortgage of $220,000 on his personal residence at the time he transferred it to the Trust. (Doc. 45-3 at ¶ 6).

McClelland, Jr. testified that he "notified First Georgia of all transfers into the Partnership and Trust with an affidavit and by telling them in multiple conversations before and after the transfers." (Doc. 35-3 at ¶ 4). The "affidavit" McClelland, Jr. refers to is a financial report, dated March 27, 2008, which he prepared "in connection with [his] service as a bank director in Georgia" (the "Financial Report"). (Docs. 61 at 74:8-12, 282-83). McClelland, Jr. created the Financial Report because "[a]ll board of directors are required to submit this at the beginning of each year for the financial records required by the State of Georgia." (Doc. 61 at 30:20-31:14). Under "Assets," and in the category "Real Estate – from Schedule A," McClelland, Jr. wrote, "N/A." (Doc. 61 at 282). Under "Schedule A – Real Estate Owned," McClelland, Jr. listed "Residence," "NC house," and "Land +- 70 Acres" and, under "Title in Whose Name," he wrote, "The McClelland Qualified Personal Residential Trust," "The McClelland Family Limited Partnership," and "same," respectively.[6] (Doc. 61 at 283). When asked with whom he had the "multiple conversations," McClelland, Jr. testified that "all of the board

---

[5] McClelland, Jr. testified that he "transferred [his] interest in the Trust and part of the Partnership property in exchange for the debt owed [sic] by Allison and my son's legal work." (Doc. 45-3 at ¶ 5). Allison testified that she "transferred [her] interest in the North Carolina property for [her] interest in the Partnership and Trust." (Doc. 45-5 at ¶ 5). McClelland, III testified that he "provided legal representation in exchange for [his] ownership of the Trust and part of the Partnership." (Doc. 45-4 at ¶ 1).

[6] The Financial Report also lists as assets $40,000 in cash, $80,000 in "[n]otes, loans and other accounts receivable considered good and collectible," and $846,000 in "marketable securities," including $840,000 in "First GA Community Bank." (Doc. 61 at 282-83).

-4-

members knew that I had moved those assets.  Several of the board members knew I was going to move the assets, 'cause they're the ones that told me I should back in 2007, specifically Dan Fears, who was an attorney and also on the board with me that started me looking at that.  And in a small bank in a small town, there's no secrets.  You kind of tell everybody."  (Doc. 61 at 74:13-22).[7]

McClelland, Jr. resigned from the board of directors in May 2008.  (Doc. 61 at 133:14-19, 166:3-7).  He signed the final renewal of Loan 2000 on August 18, 2008, and the final renewal of Loan 6800 on July 11, 2008.  (Doc. 61 at 20:7-14, 25:4-7).  The Plaintiff contends that Loan 2000 and Loan 6800 went into default on November 17, 2008.  (Doc. 56-1 at ¶ 18).  The Defendants dispute this, claiming that "[Loan] 2000 was due on November 17, 2008 but was in the process of being renewed."  (Doc. 66-1 at ¶ 18).  At the time, McClelland, Jr. was expecting to receive almost $90,000 from his deferred compensation and bank-owned life insurance and "had a line of credit for about $30,000."  (Doc. 61 at 41:11-14).  "Historically," McClelland, Jr. would use those "to keep all the notes current," but "for some reason, when I went back in in November, it had changed."  (Doc. 61 at 41:15-20).  McClelland, Jr. testified that when Loan 2000 and Loan 6800 came due in November, he was discussing with First Georgia what to do: "I asked for a line of credit.  For some reason, something was going on.  And before we could reach an agreement or whatever, the bank failed."[8]  (Doc. 61 at 39:24-40:13).

---

[7] The Plaintiff's business records regarding Loan 2000 and Loan 6800 contain the Financial Report.  (Doc. 41-2 at ¶¶ 4, 9).

[8] When the bank failed all of McClelland, Jr.'s assets were seized.  (Doc. 61 at 39:24-40:2, 14-17).  In January 2009, McClelland, Jr. completed and signed a financial statement that showed him with a negative net worth.  (Doc. 66-1 at ¶ 33).  Beginning in early 2009, he failed to make payments on the mortgage on his personal residence.  (Doc. 66-1 at ¶ 28).  He also defaulted on two other loans by First Georgia and on a loan by McIntosh State Bank.  (Doc. 66-1 at ¶¶ 31-

On December 5, 2008, First Georgia failed and went into receivership by the Federal Deposit Insurance Corporation ("FDIC"). (Doc. 66-1 at ¶ 19). The FDIC sued McClelland, Jr. to recover amounts due on Loan 2000 and Loan 6800 in the United States District Court for the Northern District of Georgia[9] and obtained a judgment against him on February 22, 2011. (Doc. 66-1 at ¶ 21). First Georgia and the FDIC refused to pay McClelland, Jr. his deferred compensation and bank-owned life insurance.[10] (Doc. 61 at 41:23-24). On December 1, 2011, the FDIC assigned its interest in Loan 2000 and Loan 6800 and the related judgment to the Plaintiff. (Doc. 66-1 at ¶ 22). On March 18, 2013, the Plaintiff obtained an amended final judgment in the Northern District of Georgia case in the amount of $73,983.83 after being allowed to intervene as a plaintiff. (Doc. 66-1 at ¶ 23). The judgment remains unpaid in its entirety. (Doc. 66-1 at ¶ 25).

The Plaintiff has moved for partial summary judgment, seeking to set aside the seven transfers of property, which it contends are fraudulent, as well as damages, injunctive relief, and the imposition of a constructive trust pursuant to Georgia's Uniform Fraudulent Transfers Act ("GUFTA"), O.C.G.A. § 18-2-70, *et seq.*[11] (Doc. 56). The Trust has moved for summary judgment, arguing it took in good faith and for a

---

32). It is undisputed that he was "out of work" for a year and a half after March 2008. (Doc. 66-1 at ¶ 37).

[9] *FDIC v. McClelland*, 1:09-cv-2352-RLV (N.D. Ga.).

[10] McClelland, Jr. filed a breach of contract action against First Georgia and the FDIC, alleging that the Defendants breached the agreements regarding his deferred compensation and bank-owned life insurance. *McClelland v. First Ga. Cmty. Bank*, 5:09-cv-256-CAR (M.D. Ga.). Summary judgment was granted against McClelland, Jr. because his claims were barred pursuant to 12 U.S.C. § 1823(e). *Id.*

[11] The Plaintiff has not moved for summary judgment on its claim for attorney's fees and expenses of litigation pursuant to O.C.G.A. § 13-6-11.

reasonably equivalent value under O.C.G.A. § 18-2-78. (Doc. 45). Finally, McClelland, Jr. has moved for summary judgment, arguing he is entitled to dismissal as a matter of law based on the defense of ratification and waiver. (Doc. 35).

## II. DISCUSSION

### A. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)). The burden rests with the moving party to prove that no genuine issue of material fact exists. *Id.* The party may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

"If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment." *Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1371 (S.D. Fla. 2009) (citing *Four Parcels of Real Prop.*, 941 F.2d at 1438). The moving party must carry its burden by presenting "credible evidence" affirmatively showing that, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *Four Parcels of Real Prop.*, 941 F.2d at 1438. In

other words, the moving party's evidence must be so credible that, if not controverted at trial, the party would be entitled to a directed verdict. *Id.*

"If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Id.* (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)) (alteration in original). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. ... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Thus, the Court "'can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists.'" *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 940, 952 (11th Cir. 1986)).

In contrast, "[w]hen the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)). The moving party "simply may show … that there is an absence of evidence to support the nonmoving party's case." *Id.* at 1438 (internal quotation marks and citation omitted). "Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial." *Info. Sys. & Networks Corp.*, 281 F.3d at 1224-25 (citing *Celotex Corp.*, 477 U.S. at 324).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotation marks and citation omitted). The Court will consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *See Am. Bankers Ins. Grp.*, 408 F.3d at 1331.

**B. Georgia Uniform Fraudulent Transfers Act**

GUFTA "is modeled on the Uniform Fraudulent Transfer Act promulgated by the national Conference of Commissioners on Uniform State Laws and adopted in various forms by 43 states and the District of Columbia." *Truelove v. Buckley*, 318 Ga. App. 207, 209, 733 S.E.2d 499, 501 (2012) (citation and internal quotation marks omitted). O.C.G.A. § 18-2-74(a) provides that a transfer made by a debtor "is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made[,]" if the debtor made the transfer:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

 (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

 (B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

O.C.G.A. § 18-2-75(a), on the other hand, provides that a transfer made by a debtor "is voidable as to a creditor whose claim arose before the transfer was made … if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

### 1. Actual Fraud

"Because actual intent to defraud is difficult to prove, [GUFTA] lists 11 nonexclusive factors (sometimes called 'badges of fraud') that can be considered in determining whether funds were transferred with the actual intent to defraud a creditor." *SRB Inv. Servs., LLLP v. Branch Banking & Tr. Co.*, 289 Ga. 1, 3-4, 709 S.E.2d 267, 270 (2011); O.C.G.A. § 18-2-74(b)(1)–(11). The Plaintiff argues it has established "multiple badges of fraud" and thus the Court should find as a matter of law that McClelland, Jr. "actually intended to defraud his creditors by transferring his interest in the [p]roperties to the Trust and the Partnership." (Doc. 56-13 at 7). Specifically, the Plaintiff argues the transfers were made to "insiders" because McClelland, III and Allison are relatives of McClelland, Jr., O.C.G.A. § 18-2-74(b)(1); McClelland, Jr. continued to reside at his personal residence after the transfer to the Trust, O.C.G.A. § 18-2-74(b)(2); he did not receive reasonably equivalent value for the transfers because they were made by deed of gift, no purchase price was paid, and the alleged agreements with McClelland, III and Allison cannot support a finding of reasonably equivalent value, O.C.G.A. § 18-2-74(b)(8); the transfers were executed shortly before Loan 2000 and Loan 6800 were due, O.C.G.A. § 18-2-74(b)(10); and, he was insolvent or became insolvent shortly after the transfers because he was not paying his debts at

the time of the transfers or shortly thereafter, O.C.G.A. § 18-2-74(b)(9).[12]  (Doc. 56-13 at 7-13).

The Defendants admit the transfers were made to insiders but argue there are genuine disputes of fact with respect to the other badges of fraud.  They admit that McClelland, Jr. has continued to use the property transferred to the Trust as his personal residence but argue that his right of use has changed under the terms of the Trust.  (Docs. 66 at 11; 61-3 at 3-15).  They argue the evidence shows McClelland, Jr. received more than reasonable value for the transfers in light of his agreements with Allison and McClelland, III and the fact that the $220,000 mortgage should be considered in determining the value of the property transferred to the Trust.  They argue that McClelland, Jr. "clearly did not run up any debts shortly before a transfer" and, given his "long history of repayment [and] renewals," this badge weighs against the Plaintiff.  (Doc. 66 at 19).  They provide evidence that McClelland, Jr. was not insolvent in March 2008 and that his "capital diminished and cash flow stopped" only after the "unforeseen events of the FDIC taking the stock collateral to zero, pulling his accounts, and First Georgia breaching his contracts."  (Docs. 61 at 72:3-20; 66 at 17).  Finally, the Defendants provide evidence that McClelland, Jr. fully disclosed the transfers to First Georgia, which weighs against the Plaintiff, O.C.G.A. § 18-2-74(b)(3).  (Docs. 35-3 at ¶ 4; 61 at 74:8-22, 282-83).

---

[12] "A debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets." O.C.G.A. § 18-2-72(a).  Moreover, "[a] debtor who is generally not paying his or her debts as they become due other than as a result of a bona fide dispute is presumed to be insolvent.  The presumption imposes on the party against which the presumption is directed the burden of proving that the nonexistence of insolvency is more probable than its existence." O.C.G.A. § 18-2-72(b).

"The law is well established that the question of intent in a fraudulent conveyance case is generally one for the jury."[13] *Target Corp. v. Amerson*, 326 Ga. App. 734, 742, 755 S.E.2d 333, 341 (2014). "[T]he critical inquiry is [McClelland, Jr.'s] intent at the time of transfer." *Roach v. Roach*, 327 Ga. App. 513, 515-16, 759 S.E.2d 587, 589 (2014) (citation and internal quotation marks omitted). The Court cannot say as a matter of law that there is no genuine dispute with respect to McClelland, Jr.'s intent. Not only is there evidence that McClelland, Jr. made these transfers as part of his estate plan, there is evidence that a director of First Georgia recommended that he undertake these efforts in the first place, that First Georgia then renewed the loans with full knowledge of the transfers, and that McClelland, Jr. was far from insolvent at the time of the transfers and only became so after First Georgia failed and froze his accounts. Therefore, the Defendants have put forth enough evidence to suggest that the transfers were not made to defraud First Georgia. *Cf. Target Corp.*, 326 Ga. App. at 742-43, 755 S.E.2d at 341 (reversing the denial of a directed verdict where "the record present[ed] absolutely no evidence from which a jury could infer that the conveyance was motivated by some nefarious intent"); *Williams v. Williams*, 255 Ga. 264, 265, 336 S.E.2d 244, 246 (1985) (reversing the denial of a directed verdict where the husband "freely admit[ted] that the property was placed in his former wife's name in order to avoid any alimony claim against it by his second wife").

### 2. Constructively Fraudulent Transfers

"While actual or intentional fraud requires a showing of intent, '[c]onstructive fraudulent transfers are established conclusively, without regard to the actual intent of the parties … .'" *Truelove*, 318 Ga. App. at 210, 733 S.E.2d at 501 (citation and internal

---

[13] Of course, whether a party meets its summary judgment burden is a matter of federal law.

quotation marks omitted). Relying on the same evidence discussed above, the Plaintiff argues the Court can find as a matter of law that McClelland, Jr. was insolvent at the time of the transfers or should have reasonably believed that he would become insolvent and that he transferred his interest in the properties without receiving reasonably equivalent value. (Doc. 56-13 at 14-15). Yet, as discussed above, there is at least a genuine dispute with respect to whether McClelland, Jr. "[i]ntended to incur, or believed or reasonably should have believed that he … would incur, debts beyond his … ability to pay as they became due" and "was insolvent at [the] time [of the transfers] or … became insolvent as a result of the transfer[s]." O.C.G.A. §§ 18-2-74(a)(2)(B), 18-2-75(a). Accordingly, the Plaintiff's motion for summary judgment (Doc. 56) is **DENIED**.[14]

### 3. Defenses

The Trust argues it is entitled to summary judgment because it took in good faith and for a reasonably equivalent value. *See* O.C.G.A. § 18-2-78. Construing the evidence in the light most favorable to the Plaintiff, the Court cannot say as a matter of law that the Trust gave reasonably equivalent value for the property transferred to it, which had a provable "As-Is" market value of $250,000. (Docs. 45-1 at 1; 66-1 at ¶ 16). At the very least, public record evidence indicates that McClelland, Jr. received no value

---

[14] The Plaintiff objects to a declaration filed by McClelland, III, which "attaches" 41 exhibits to the Defendants' response to the Plaintiff's motion for summary judgment. (Doc. 71). The Plaintiff argues the declaration violates 28 U.S.C. § 1746(2) and does not state that it is made on personal knowledge or that McClelland, III is competent to testify on the matters stated. The Plaintiff argues that the 41 exhibits should be excluded from the Court's consideration of its motion for summary judgment because the "Defendants have not attempted to show [their] admissibility" and, in the alternative, that at least four of the exhibits should be excluded because they are hearsay documents. (Doc. 71 at 3-4). Even if the Court did not consider the 41 exhibits attached to the Defendants' response (many of which can be found elsewhere in the record), the Plaintiff has not shown that it is entitled to judgment as a matter of law.

for the transfer. (Doc. 66-1 at ¶ 13). Accordingly, the Trust's motion for summary judgment (Doc. 45) is **DENIED.**

Finally, McClelland, Jr. has moved for summary judgment as to all of the Plaintiff's claims, arguing that "[w]ith complete knowledge of all transfers, First Georgia ratified the contracts as made by accepting payments, origination fees, and then, renewing both contracts, thereby waiving any alleged fraud."[15] (Doc. 35-1 at 1). The Plaintiff argues this defense fails because "whether a transfer was disclosed or not is only one of many factors that go to whether an actual fraudulent transfer is shown, and such disclosure has nothing to do with a claim for constructive fraudulent transfer." (Doc. 40 at 2). This argument fails to recognize McClelland, Jr.'s point. He does not just argue that his disclosure is evidence of the absence of fraud; he argues, as an affirmative defense, that First Georgia's knowledge of the transfers operates as a total bar to its claims. However, the Plaintiff also argues McClelland, Jr. has not established as a matter of law that First Georgia had knowledge of the transfers before it renewed Loan 2000 and Loan 6800.

GUFTA provides that under certain conditions a transfer "is *voidable* as to a creditor." O.C.G.A. §§ 18-2-74(a)(1)-(2), 18-2-75(a) (emphasis added). "The term 'voidable' is defined as 'That which may be avoided, or declared void; not absolutely void, or void in itself. That which operates to accomplish the thing sought to be accomplished, until the fatal vice in the transaction has been judicially ascertained and declared.'" *Dal-Tile Corp. v. Cash N' Go, Inc.*, 226 Ga. App. 808, 811, 487 S.E.2d 529, 532 (1997) (Beasley, J., concurring) (citation omitted); *see Stoudemire v. HSBC Bank USA*, 2015 WL 3480428, at *1 (Ga. Ct. App.) ("A void contract is one that has no effect

---

[15] It is not clear why McClelland, Jr. alone moves for summary judgment on this ground.

whatsoever and is incapable of being ratified, while a voidable contract is one that is unenforceable at the election of the injured party.").

Because a fraudulent transfer "is not void, but voidable," courts have generally held that "it can be ratified by a creditor who is then estopped from seeking its avoidance." *In re Adelphia Recovery Trust*, 634 F.3d 678, 691 (2d Cir. 2011) (citation and internal quotation marks omitted); *see also In re Lyondell Chem. Co.*, 503 B.R. 348, 383-84 (Bankr. S.D.N.Y. 2014) ("[C]reditors who are participants in an alleged fraudulent transfer, or who have ratified it, cannot then seek to have that transfer avoided. The rubrics under which that conclusion has been reached have varied slightly—'ratification,' 'consent,' 'estoppel,' or 'material participa[tion] in the transaction'—but the underlying point is the same. Creditors who authorized or sanctioned the transaction, or, indeed, participated in it themselves, can hardly claim to have been defrauded by it, or otherwise to be victims of it."). *But see In re Morse Tool, Inc.*, 108 B.R. 389, 390 (Bankr. D. Mass. 1989).[16]

Assuming that ratification (or estoppel or whatever it may be called) is a defense to a GUFTA claim, the question of ratification generally "depends upon the intention of the parties, and is a matter of fact to be determined by the jury." *Nalley v. Langdale*, 319 Ga. App. 354, 366, 734 S.E.2d 908, 918 (2012) (quoting *Warner v. Hill*, 153 Ga.

---

[16] Georgia courts have not addressed this issue since Georgia adopted GUFTA. Before GUFTA's adoption, Georgia courts had held that a creditor's knowledge of a transfer prior to its renewal of a loan bars a fraudulent conveyance claim. *See Peachtree Bank & Tr. Co. v. Atha*, 151 Ga. App. 565, 260 S.E.2d 559 (1979); *Jowers v. High Point Furniture Co.*, 10 Ga. App. 297, 73 S.E. 415 (1912). Given the overwhelming authority that such knowledge can bar claims for both actual and constructively fraudulent transfers, the Court is confident that a Georgia court would hold that a creditor with knowledge of a transfer at the time credit was advanced can be barred from attacking the transfer under GUFTA. *See, e.g., Calaska Partners, L.P. v. Lavigne*, 1998 WL 34086069 (Super. Ct. Me.); *Truelove*, 318 Ga. App. at 209-10, 733 S.E.2d at 501 ("[I]n light of the dearth of Georgia decisions construing the provisions of the Georgia UFTA, we look to the decisions of other jurisdictions for guidance.").

510, 513, 112 S.E. 478, 480 (1922)).  "Ratification involves full knowledge of all the facts."  *Warner*, 112 S.E. at 480; s*ee also Stewart v. Storch*, 274 Ga. App. 242, 245, 617 S.E.2d 218, 222 (2005) ("Generally, ratification requires both knowledge of the act and acceptance of benefits resulting from the act.").  It is true, as McClelland, Jr. points out and the Plaintiff candidly admits, that the Plaintiff is not in a position to refute his evidence with regard to whether First Georgia knew about the transfers.  The problem is none of the evidence relied upon by McClelland, Jr. is sufficient to establish, as a matter of law, that First Georgia knew about the transfers before it renewed Loan 2000 and Loan 6800.

McClelland, Jr. testified in his affidavit that "First Georgia knew of the transfers prior to renewal of the same contracts/loans" and that "First Georgia renewed said obligations to McClelland, Jr. with knowledge of transfers."  (Doc. 35-3 at ¶¶ 6, 7).  These conclusory statements are not sufficient.  McClelland, Jr. also testified that he "notified First Georgia of all transfers into the Partnership and Trust with an affidavit and by telling them in multiple conversations before and after the transfers."  (Doc. 35-3 at ¶ 4).  The Court has pieced together that when McClelland, Jr. says he notified the bank "with an affidavit" he is referring to the Financial Report.  (Doc. 61 at 74:8-12).  The Financial Report likely was sufficient to disclose the transfers and, circumstantially, it appears that First Georgia likely had it.  But McClelland, Jr. never quite puts any evidence into the record establishing that he provided First Georgia with the Financial Report before he renewed the loans.  McClelland, Jr.'s affidavit does not say when he provided it to the bank.  His affidavit says he notified "First Georgia" in "multiple

conversations" but never identifies who he notified. For all the Court knows, he walked into the bank and told the janitor. That is not sufficient.

McClelland, Jr. has also provided an affidavit from Art Hammond, President of First Georgia in 2008, who testified that "in 2008 [First Georgia] received all of the board of director's financial statements including director Joseph P. McClelland, Jr.'s for the year of 2008." (Doc. 66-3 at ¶ 4). At most, this suggests First Georgia received the Financial Report at some point in 2008. But it does not directly speak to whether First Georgia received the Financial Report before the loans were renewed. Similarly, McClelland, Jr. has provided an affidavit (which he never cites in his briefs) from Herb Warren, a member of the board of directors, who testified that "[w]hile as a director of the bank Joseph P. McClelland, Jr. disclosed to all board of directors that he did an estate plan and transferred property into entities" and that McClelland, Jr. "resigned from the bank board late spring 2008." (Doc. 66-5 at ¶¶ 2, 6, 7). Again piecing things together on its own, the Court could conclude that McClelland, Jr. resigned from the board before the loans were renewed and thus that Warren's affidavit suggests First Georgia was aware of some unspecified transfers McClelland, Jr. made before the renewals. But even then the Court could not conclude as a matter of law that First Georgia was aware of the transfers at issue.

Finally, McClelland, Jr. has provided an affidavit from Pam Browning, a loan officer at First Georgia, who testified, "I think [McClelland, Jr.] was transparent about his financial position throughout 2008" and "[First Georgia] followed the normal banking procedures for all of [McClelland, Jr.'s] loan renewals." (Docs. 66-4 at ¶¶ 2-4; 66-7 at

¶¶ 2-4).  This bolsters McClelland, Jr.'s credibility, but it does not entitle him to summary judgment.[17]

In short, although the record suggests that McClelland, Jr. *could* establish that First Georgia had notice of the transfers before the loans were renewed, he has not yet proved the point as a matter of law.  Therefore, his motion for summary judgment (Doc. 35) is **DENIED.**

### III.  CONCLUSION

Defendant McClelland, Jr.'s, Defendant Trust's, and the Plaintiff's motions for summary judgment (Docs. 35; 45; 56) are **DENIED**.

**SO ORDERED**, this 21st day of September, 2015.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

[17] McClelland, Jr. also relies on the transfers being recorded in the public record as evidence that First Georgia had knowledge of the transfers; however, he cites no Georgia case law suggesting that, standing alone, this is sufficient as a matter of law to say that First Georgia intended to ratify the transfers.